# In the United States Court of Federal Claims

No. 22-728L
Filed: January 23, 2023
FOR PUBLICATION

---

**MONTI PAVATEA GILHAM,**

**Plaintiff,**

**v.**

**UNITED STATES,**

**Defendant.**

---

*Judd. M. Jensen*, Browning, Kaleczyc, Berry & Hoven, P.C., Bozeman, MT, for the plaintiff.

*Esosa Aimufua* and *Christopher Hair*, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., *Dondrae Maiden, Brandon M. Porter, and Karen F. Boyd*, U.S. Department of the Interior, of counsel, for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

The plaintiff, Monti Pavatea Gilham, is an enrolled member of the Blackfeet Indian Tribe. The plaintiff leased Indian trust land on the Blackfeet Reservation in Montana. The plaintiff enrolled her leased trust land under two contracts in the Conservation Reserve Program ("CRP"), a program administered by the Farm Service Agency ("FSA") within the United States Department of Agriculture ("USDA"). The CRP contracts were co-signed by the Bureau of Indian Affairs ("BIA") in its capacity as trustee of the tribal land. In the CRP, participants like the plaintiff are paid to maintain their land according to mutually-agreed conservation plans.

After placing her leased tribal land in the CRP, the plaintiff became a victim of severe physical domestic abuse. As a result of this abuse, the plaintiff alleges she was unable to perform the maintenance required by the CRP contracts. The plaintiff's CRP contracts were therefore terminated prematurely in November 2015. After the termination of her CRP contracts, the plaintiff sought and received equitable relief from the USDA from certain early-termination penalties. She was absolved from having to repay CRP fees previously paid to her under the CRP contracts. The BIA did not assist the plaintiff either in performing the required maintenance under the CRP contracts or in obtaining equitable relief from the USDA.

In June 2022, the plaintiff sued the United States, acting through the BIA, both for the BIA's failure to help the plaintiff perform the maintenance required under the CRP contracts and for its failure to help her obtain equitable relief from the USDA. The plaintiff alleges that the

defendant's failures to assist her violated the Administrative Procedure Act ("APA").  The plaintiff also alleges that the defendant's failure to help perform the required maintenance breached the trust and fiduciary duties owed to the plaintiff, as a member of an enrolled tribe, pursuant to the CRP contracts co-signed by the BIA.  The plaintiff seeks the unpaid funds she would have collected under the CRP contracts but for their early termination.  The defendant moves to dismiss the complaint under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC").

The defendant's motion is granted.  The claims, as pleaded, do not rely on a money-mandating statute or regulation.  Most of the plaintiff's claims are also untimely under the Tucker Act's six-year statute of limitations.  Although the plaintiff's CRP contracts were terminated because she was unable to comply with the terms and conditions of those contracts due to severe mental and physical injuries she had suffered from domestic abuse, the plaintiff's plight, while prompting sympathy, cannot support the assertion of jurisdiction otherwise lacking under current law.  Accordingly, the complaint must be dismissed.

## I.    BACKGROUND[1]

### A.    Conservation Reserve Program

The CRP was established by the USDA pursuant to 16 U.S.C. §§ 3831-3835 and is governed by regulations set forth in 7 C.F.R. §§ 1410.1-1410.90.  The CRP's purpose is "to conserve and improve the soil, water, and wildlife resources of such [enrolled] land and to address issues raised by State, regional, and national conservation initiatives."  16 U.S.C. § 3831(a).  The FSA, the Commodity Credit Corporation, and FSA state and county committees help administer the program.  7 C.F.R. § 1410.1.

A "producer" may enroll eligible land in the CRP by contracting with the Commodity Credit Corporation.  *Id.* at § 1410.3(a).[2]  These contracts must be for 10-15 years and must be

---

[1] In considering the defendant's motion to dismiss, the Court assumes the facts alleged in the plaintiff's complaint not controverted by the defendant to be true.  *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012).  Because the defendant brought a motion to dismiss for lack of subject-matter jurisdiction challenging the factual allegations in the complaint, namely the facts surrounding when the plaintiff's claims accrued and when the CRP contracts were terminated, the Court may consider extrinsic evidence relevant to the timeliness of the claims.  *Id*.  This summary of the facts does not constitute findings of fact but is simply a recitation of the plaintiff's allegations and relevant extrinsic evidence.

[2] A "producer" is "an owner, operator, landlord, tenant, or sharecropper, who shares in the risk of producing a crop and who is entitled to share in the crop available for marketing from the farm, or would have shared had the crop been produced."  7 C.F.R. § 718.2 (definition incorporated into the CRP regulations by 7 C.F.R. § 1410.2(a)).

signed by both "the producer" and "the owners" of the land. *Id.* at §§ 1410.7, 1410.32(d). The regulations specifically contemplate circumstances in which "an operator of eligible land seeks to participate without the owner's participation." *Id.* at § 1410.5(a)(1).

During the enrollment period, "[a] producer must obtain and adhere . . . to a conservation plan prepared in accordance with [Commodity Credit Corporation] guidelines and the other provisions of § 1410.22." *Id.* at § 1410.3(b). In return for their enrollment, a "participant" receives "annual rental payments" and "cost-share payments."[3] *Id.* at §§ 1410.2, 1410.40, 1410.42. If there are multiple participants, the annual rental payments are divided among them according to the terms of the CRP contract. *Id.* at § 1410.42(c). All participants in a CRP contract who "ha[ve] a share of the annual rental payment greater than zero" are "jointly and severally responsible" for compliance with a CRP contract's terms. *Id.* at § 1410.20(a)(9).

If a CRP contract is terminated prematurely, a participant forfeits the right to any further payments, and all payments made to a participant under the contract must be repaid with interest. *Id.* at §§ 1410.32(e)(2), 1410.52(b)(1). In such a case, a participant may also be liable for liquidated damages. *Id.* at §§ 1410.32(e)(2), 1410.52(b)(2).

### B.    Factual Allegations

The plaintiff is an enrolled member of the Blackfeet Indian tribe. (ECF 1 at ¶ 7.) For generations members of her family have been farmers and ranchers on Cut Bank Creek, Montana. (*Id.*) After the plaintiff's father passed away, the plaintiff and her mother took over "the family's farming and ranching operation." (*Id.*) In September 2006, the plaintiff signed two CRP contracts. Each contract enrolled a parcel of tribal land in the CRP for a period of ten years beginning on October 1, 2007. (ECF 6-1, at 3, 6.) In 2015, for reasons not alleged in the complaint, the plaintiff signed two CRP contracts continuing the enrollment of the same land in the CRP through the original termination date of September 30, 2017. (*Id.* at 2, 7-8 (using the same "Farm Number," "Tract Number(s)," and "Acres For Enrollment" as listed on the earlier contracts).) The only apparent difference between the contracts signed in 2006 and 2017 is that the fields covered were broken up by acreage, and the contracts were assigned new numbers. (*Id.*)

Both sets of CRP contracts were signed by the plaintiff as a "100.00%" participant and a BIA representative as a "0.00%" participant. (*Id.* at 2-8; *see also* ECF 1 at ¶ 15 ("the United States had co-signed each contract at issue as a trustee").) The BIA representative's signatures were in the United States' official role as the trustee of Blackfeet tribal land. (ECF 1 at ¶ 9.)

The CRP contracts the plaintiff signed required, among other things, that "the participant . . . control . . . all weeds, insects, pests and other undesirable species to the extent

---

[3] A "participant" is "one who participates in, or receives payments or benefits in accordance with any of the programs administered by FSA." 7 C.F.R. § 718.2 (definition incorporated into the CRP regulations by 7 C.F.R. § 1410.2(a)).

3

necessary . . . and to provide such maintenance as necessary to avoid an adverse impact on surrounding land . . . ." (ECF 6-5 at 3.) The plaintiff maintained the trust land in accordance with the CRP contracts "for more than seven (7) years without serious incident." (ECF 1 at ¶ 8.) At no point relevant to the dispute, if ever, did the BIA provide any assistance in maintaining the land covered by the CRP contracts. (*Id.* at ¶¶ 4, 15-17, 20, 26-27.)

In 2013, the plaintiff began experiencing severe difficulties in her personal life when her husband became addicted to methamphetamine and abandoned the family. (*Id.* at ¶ 10.) This abandonment left the plaintiff "a single mother to [ ] minor children." (*Id.*) In 2014, the plaintiff lost her job. (*Id.*) The plaintiff then began a relationship with a local firefighter, who physically abused her. (*Id.*) The plaintiff's new boyfriend also limited the plaintiff's communications with family, friends, and the FSA. (*Id.*)

To escape this relationship, the plaintiff moved to Missoula, Montana in 2015, upon being accepted into a master's program with a full scholarship. (*Id.* at ¶¶ 10-11.) The plaintiff's abusive boyfriend, however, followed her to Missoula and forcibly moved in with her. (*Id.* at ¶ 11.) On October 31, 2015, the plaintiff's boyfriend attacked and strangled her, causing severe injuries that put her in the hospital and took weeks to heal. (*Id.*; ECF 7 at 6-7.) The police subsequently arrested the plaintiff's boyfriend. (ECF 1 at ¶ 11.) The plaintiff's injuries and emotional trauma caused her to withdraw from her master's program. (*Id.*) The plaintiff suffered from major anxiety attacks and depression and "battled suicidal thoughts." (*Id.* at ¶13.) As a result of these events and conditions, the plaintiff was unable to complete the required maintenance on the lands covered by her CRP contracts. (*Id.* at ¶¶ 12-14.)

During the summer and fall of 2015, the FSA mailed the plaintiff notices regarding the CRP maintenance. (*Id.* at ¶ 12.) The plaintiff did not receive these notices because she had failed to update her mailing information with the FSA after moving to Missoula, and no one was available to sign for the letters at her old address. (*Id.*) The plaintiff did receive an email from the FSA county office notifying her about the time-sensitive need to complete the CRP maintenance. (*Id.*) The plaintiff's abusive relationship and emotional trauma, however, prevented her from reacting or responding. (*Id.*) Because of the plaintiff's failure to perform the required maintenance, the FSA prematurely terminated the plaintiff's CRP contracts in November 2015, pursuant to a notice dated October 20, 2015. (ECF 6-3; *see also* ECF 1 at ¶¶ 8, 13.)[4]

Because the plaintiff's CRP contracts were terminated prematurely, the plaintiff was required to refund all CRP payments that she had been paid under the CRP contracts prior to the

---

[4] The complaint alleges that the plaintiff's CRP contracts were terminated in the fall of 2015. (ECF 1 at ¶ 8.) In their briefs, the defendant claimed, and the plaintiff agreed, that the CRP contracts were terminated in November 2015 pursuant to a notice dated October 20, 2015. (ECF 6 at 9 n.4 (citing ECF 6-3); ECF 7 at 8 (citing ECF 6-3).) During oral argument, the plaintiff again agreed that the CRP contracts were terminated in November 2015 pursuant to a notice dated October 20, 2015. (ECF 11 at 34:8-11.)

contracts' termination.  (ECF 1 at ¶ 14.)  The plaintiff requested equitable relief from this obligation from the USDA's National Appeal Division.  (*Id.*)[5]  The plaintiff also sought the BIA's assistance in pursuing relief before the USDA.  (*Id.* at ¶ 15.)  The BIA denied the plaintiff any assistance, claiming that it was not required to assist her under the CRP contracts.  (*Id.*)

In February 2021, the USDA granted the plaintiff all the relief she requested.  (*Id.* at ¶ 14.)  The plaintiff alleges that the BIA's refusal to assist her in pursuing her appeal to the USDA caused the plaintiff to spend significantly more time, money, and resources in seeking that relief.  (*Id.* at ¶ 15.)

On June 30, 2022, the plaintiff filed the complaint in this case.  (ECF 1.)  On November 15, 2022, the defendant filed a motion to dismiss.  (ECF 6.)  On December 13, 2022, the plaintiff filed her response, (ECF 7), and the defendant filed a reply on December 27, 2022, (ECF 9.)  Oral argument was held on January 10, 2023.

## II.   STANDARD OF REVIEW

Under RCFC 12(b)(1), a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  When a plaintiff's asserted jurisdictional facts are challenged, only those factual allegations that the defendant does not controvert are accepted as true.  *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012).  A court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts and may review evidence outside the pleadings.  *Id.* (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)).  Accordingly, in resolving the defendant's motion to

---

[5] At oral argument, the plaintiff claimed that she had first sought relief from the FSA county committee during the second half of 2016.  (ECF 11 at 70:15-23 (claiming the plaintiff first appealed the CRP contract termination on October 18, 2016, the FSA county committee heard the appeal on November 10, 2016, and the committee issued its decision on April 5, 2017).)  The complaint includes no allegations concerning the plaintiff's request for relief in 2016.  At oral argument, the plaintiff asserted that the FSA county committee could have reinstated her CRP contracts but did not.  (*Id.* at 43:20-25.)  The plaintiff did not pursue any other administrative remedies until 2020, when the USDA's National Appeal Division allowed a late appeal because the FSA county committee failed to provide her notice of her appeal rights.  (*Id.* at 42:1-14, 58:8-17.)  By 2020, the plaintiff had secured counsel but had lost her lease of the land enrolled in the CRP, limiting the available relief.  (*Id.* at 26:25-27:3, 77:15-25.)  Because neither the complaint nor the plaintiff's briefs mention these claims concerning the FSA county committee, they are waived and will not be considered.  In any event, the plaintiff has not made any claim against the USDA or the FSA in her complaint, which is predicated on the BIA's alleged failure to assist her in performing the CRP-required maintenance on the covered land, (ECF 1 at ¶¶ 6, 15-17, 20, 24, 26).

dismiss, information provided by the defendant relevant to the jurisdictional issues raised by its motion to dismiss may be considered.

The plaintiff has the burden of establishing jurisdiction by a preponderance of the evidence. *Trusted Integration, Inc*, 659 F.3d at 1163. If a court finds that it lacks subject-matter jurisdiction over the plaintiff's claim, RCFC 12(h)(3) requires dismissal of the claim.

## III. DISCUSSION

The plaintiff's complaint alleges two causes of action. In her first claim, the plaintiff alleges that the BIA violated its duties under the APA to "act reasonably and not abuse [its] discretion." (ECF 1 at 8 (all capitalized words made lowercase).) The plaintiff alleges that the BIA violated the APA in two ways. First, the plaintiff alleges the APA was violated by the "BIA's failure to carry out its basic contractual duties under the CRP contracts it co-signed with [the plaintiff] – such as routine weed maintenance on the fields under contract – resulted in the early termination of [the plaintiff's] CRP contracts after she was the victim of domestic violence." (*Id.* at ¶ 20.) Second, the plaintiff alleges that the "[d]efendant's failure to assist [the plaintiff] in maintaining the CRP contracts and to provide her reasonable assistance to obtain equitable relief after the contracts were terminated prematurely was arbitrary, capricious, an abuse of discretion, and is not otherwise in accordance with the law." (*Id.* at ¶ 21.)

The plaintiff also alleges a claim for the "violation of defendant's trust and fiduciary duties owed to plaintiff pursuant to the CRP contracts defendant co-signed." (*Id.* at 9 (all capitalized words made lower-cased).) Specifically, the plaintiff alleges that "[t]he United States decision to do nothing to assist [the plaintiff] to maintain the CRP contracts in good standing was a clear breach of the trust and fiduciary duties it owed [the plaintiff] as an enrolled tribal member of the Blackfeet Tribe." (*Id.* at ¶ 27.) The plaintiff's breach-of-trust claim does not mention the alleged failure of the BIA to assist her in obtaining equitable relief from the USDA.

The defendant has moved for dismissal pursuant to RCFC 12(b)(1), contesting subject-matter jurisdiction over the plaintiff's complaint. The defendant argues that the plaintiff has not identified a money-mandating statute or regulation as required by the Tucker Act. (ECF 6 at 11.) Specifically, the defendant argues that the APA is not a money-mandating statute, and that the CRP contracts cannot create enforceable trust duties because the "'[g]overnment assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute.'" (ECF 6 at 14 (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011)).) The defendant also argues that the plaintiff's claims are outside the Tucker Act's six-year statute of limitations because her claims accrued no later than the November 2015 termination of the CRP contracts. (*Id.* at 16-17.)

### A. Money-Mandating Source of Law

The jurisdiction of the Court of Federal Claims "depends wholly upon the extent to which the United States has waived its sovereign immunity to suit . . . ." *United States v. King*, 395 U.S. 1, 4 (1969). The waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Id.*

6

The jurisdiction of the Court of Federal Claims arises under the Tucker Act, which provides in relevant part that:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1); *see also* 28 U.S.C. § 1505 (extending the jurisdiction of the Court of Federal Claims to claims brought by "any tribe, band, or other identifiable group of American Indians" that would otherwise fall within the court's jurisdiction).

The Supreme Court has held that the "Tucker Act, of course, is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, the substantive right must come from a separate, money-mandating source of substantive law. *See Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005).

Thus, for jurisdiction to exist over the plaintiff's claims under the Tucker Act, the plaintiff must identify at least one money-mandating source of substantive law for those claims.

### 1.    The APA

The plaintiff's APA claim must be dismissed because it is not based on a money-mandating statute.

It is a well-settled conclusion that the APA is not a money-mandating statute over which the Court of Federal Claims can exercise jurisdiction under the Tucker Act. In *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003), the Federal Circuit expressly held that "the Court of Federal Claims lacks APA jurisdiction." This holding follows that of *Murphy v. United States*, 993 F.2d 871, 874 (Fed. Cir. 1993), in which the Federal Circuit had held that "the Claims Court has no authority to invoke the APA." The Federal Circuit has also emphasized that "the APA does not authorize an award of money damages at all; to the contrary, [S]ection 10(a) of the APA, 5 U.S.C. § 702, specifically limits the Act to actions seeking relief other than money damages." *Wopsock v. Natchees*, 454 F.3d 1327, 1333 (Fed. Cir. 2006) (internal quotation omitted).

Recognizing the inability to rest a money-mandating claim on the APA, the plaintiff argues that under the "Trust Doctrine," damages may be presumed in this case because the plaintiff is an Indian. (ECF 7 at 11-16.) Specifically, the plaintiff argues that "the Court should review the APA claim under the very different standards set forth in *Inter-Tribal Council [of Arizona, Inc. v. United States*, 956 F.3d 1328 (Fed. Cir. 2020)]," a breach-of-trust case under the Indian Tucker Act. (ECF 7 at 16.)

7

The trust doctrine affords the plaintiff no relief for two reasons.  First, as the name implies, the trust doctrine does not apply to an APA claim because a claim for a breach of trust is itself a claim for money damages.  *See* Gregory C. Sisk, "Yesterday and Today: Of Indians, Breach of Trust, Money, and Sovereign Immunity," 39 Tulsa L. Rev. 313, 316–17 (2003) ("[W]hen the grievances of Native Americans against the government for neglect of trust responsibilities are at issue, the trust doctrine itself provides the right to a monetary recovery.").

Although the plaintiff elsewhere asserts a direct claim for a breach of trust, the plaintiff's APA claim is a run-of-the-mill APA claim that the BIA's actions were "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  (ECF 1 at ¶ 19 (quoting 5 U.S.C. § 706(2)(A)).)  Because the trust doctrine categorically does not apply to an APA claim, including the plaintiff's particular APA claim, citing that doctrine to try to salvage her APA claim is unavailing.

Even if the trust doctrine applied to an APA claim, the trust doctrine cited by the plaintiff only applies if a statute or regulation establishes the fiduciary responsibility on which the breach-of-trust claim is premised.  *United States v. Navajo Nation* ("*Navajo II*"), 556 U.S. 287, 301 (2009) (noting that trust principles are only relevant if a plaintiff identifies "rights-creating or duty-imposing statutory or regulatory prescriptions . . . and if that prescription bears the hallmarks of a conventional fiduciary relationship") (cleaned up). The Federal Circuit applied that standard to find that the underlying statute at issue in *Inter-Tribal Council* was money-mandating because it "clearly establishes fiduciary obligations of the Government in the management of the security to be held in trust . . . ."  956 F.3d at 1338-39, 1344 (cleaned up).

In contrast, the APA is a statute that applies to a whole swath of government actions and is enforceable by any person adversely affected by its violation.  *See* 5 U.S.C. §§ 551-559, 702-706.  The APA lacks the hallmarks of a conventional fiduciary relationship, such as speaking in trust terms or requiring the federal government to act in the best interests of another person.  *See Hopi Tribe v. United States*, 782 F.3d 662, 667-68 (Fed. Cir. 2015) (discussing statutory and regulatory language considered sufficient to reflect the existence of a fiduciary relationship). The plaintiff has failed to show how the APA creates fiduciary duties to her or can reasonably be read to create such duties.

As such, *Inter-Tribal Council* provides no support for the proposition that the APA is money-mandating for Indians.  Instead, the well-established proposition that the APA is not money-mandating remains applicable.  *E.g., Murphy*, 993 F.2d at 874.  The plaintiff's APA claim is beyond the jurisdiction of the Court of Federal Claims because the APA is not a money-mandating statute.

## 2.     Indian Trust Claim

There is also no jurisdiction over the plaintiff's Indian trust claim because the plaintiff fails to invoke a statute or regulation as the source of the alleged trust responsibilities.

For the Court of Federal Claims to have jurisdiction over an Indian breach-of-trust claim, the plaintiff first:

> must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties. If that threshold is passed, the court must then determine whether the relevant source of substantive law can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes. At the second stage, principles of trust law might be relevant in drawing the inference that Congress intended damages to remedy a breach.

*Navajo II*, 556 U.S. at 290–91 (cleaned up) (discussing jurisdiction under the Indian Tucker Act in the context of an Indian breach-of-trust claim).

Although the plaintiff's complaint only asserts jurisdiction under the Tucker Act, (ECF 1 at ¶¶ 2-3), *Navajo II* still provides the relevant jurisdictional test for an individual Indian's breach-of-trust claim. The Federal Circuit has described the *Navajo II* test as the two-part test used "[i]n the context of breach of duties to American Indians," even when individual Indians bring breach-of-trust claims under the Tucker Act. *Fletcher v. United States,* 26 F.4th 1314, 1324-25 (Fed. Cir. 2022) (applying the *Navajo II* test to find Tucker Act jurisdiction over a group of individual Indians' breach-of-trust claim while declining to address whether the group of plaintiffs qualified as an "identifiable group of Indians" for jurisdiction under the Indian Tucker Act); *see also Samish Indian Nation v. United States*, 419 F.3d 1355, 1364, 1367 (Fed. Cir. 2005) (noting that a "fiduciary duty can also give rise to a claim for damages within the Tucker Act or Indian Tucker Act"). Because the Indian Tucker Act requires a plaintiff to be a "tribe, band, or other identifiable group of American Indians," however, the act cannot provide jurisdiction over cases with one individual plaintiff, as is the case here.[6]

The general trust relationship between the defendant and Indians cannot alone support jurisdiction, and "[i]nstead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *United States v. Navajo Nation* ("*Navajo I*"), 537 U.S. 488, 506 (2003). "Congress may style its relations with the Indians a 'trust' without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is 'limited' or 'bare' compared to a trust relationship between private parties at common law." *Jicarilla Apache Nation,* 564 U.S. at 174 (quoting *United States v. Mitchell*, 445 U.S. 535, 542 (1980)). Further, given the sovereign interests in the creation of trust duties, "[t]he Government assumes Indian

---

[6] Other than the jurisdictional requirement that the plaintiff be a "tribe, band, or other identifiable group of American Indians," 28 U.S.C. § 1505, jurisdiction under the two Tucker Acts is often discussed interchangeably without noting any substantive differences. *See United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472-474, 477-47 (2003); *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364, 1367 (Fed. Cir. 2005).

trust responsibilities only to the extent it expressly accepts those responsibilities by statute." *Id.* at 177; *see also Hopi Tribe*, 782 F.3d at 667-68 ("[T]he United States is only subject to those fiduciary duties that it specifically accepts by statute or regulation."). Thus "[t]o establish that the United States has accepted a particular fiduciary duty, an Indian tribe must identify statutes or regulations that both impose a specific obligation on the United States and 'bear[ ] the hallmarks of a conventional fiduciary relationship.'" *Hopi Tribe*, 782 F.3d at 667 (quoting *Navajo II*, 556 U.S. at 301). "When 'the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated . . . neither the Government's 'control' over [Indian assets] nor common-law trust principles matter.'" *Jicarilla Apache Nation*, 564 U.S. at 177 (quoting *Navajo II*, 556 U.S. at 301).

*Brown v. United States* is instructive on the jurisdictional requirement to allege a statutory or regulatory basis for a breach-of-trust claim. 86 F.3d 1554 (Fed. Cir. 1996). In *Brown*, the plaintiffs were individual Indians who held beneficial interests in allotted reservation land. The plaintiffs had collectively leased their property to a series of private companies. *Id.* at 1556. The original lease was executed on a form provided by the BIA. *Id.* at 1556, 1562. Pursuant to federal law, and like the plaintiff's case, the Secretary of the Interior (the "Secretary") was required to approve the lease. *Id.* at 1556, 1561-62. Unlike the plaintiff's case, however, the Secretary in *Brown* could only approve leases for statutorily prescribed purposes and could "dictate" the terms of the lease. *Id.* The Secretary was required by regulation to ensure the lease terms were fair and was authorized by federal law to terminate a lease, under certain circumstances, without the Indian lessors' consent. *See id.* at 1556-57, 1561-62 (citing 25 U.S.C. § 415(a); 25 C.F.R. § 162.14). The Secretary could also "direct that rental payments be made to the [BIA] rather than to the individual allottee." *Id.* at 1562 (citing 25 C.F.R. § 162.5(h)(2)). The BIA also had regulatory authority to investigate the administration of the lease and to determine if the lease agreement was being violated. *Id.* at 1557.

The *Brown* plaintiffs brought a suit under the Tucker Act alleging that the Secretary breached his trust duties when he failed to ensure the lessees had fulfilled their contractual responsibilities and failed to cancel the lease once violations were found. *Id.* at 1557. The Court of Federal Claims had held that it lacked subject-matter jurisdiction because the statutory and regulatory scheme was not comprehensive enough to create a trust enforceable with money damages. *Id.* at 1557-58.

Although the Federal Circuit in *Brown* held that jurisdiction existed, it did so only after a detailed analysis of the specific statutory and regulatory prescriptions governing the BIA's and the Secretary's duties and responsibilities. *Id.* at 1561-63 (noting that "where no specific statutory requirement or regulation is alleged to have been breached by the Secretary, the money claim against the government must fail").

In contrast, the plaintiff's complaint suggests that the BIA had substantially less involvement in the CRP contracts than the Secretary did with the contracts in *Brown*. For example, the complaint alleges the BIA merely co-signed the CRP contracts. (ECF 1 at ¶ 4.) The Secretary in *Brown*, while not a signatory of the lease, had the authority under federal law to negotiate or dictate lease terms, or even direct that payment be made to the BIA. *Brown*, 86 F.3d at 1556, 1562. The Federal Circuit described this authority as so wide as to cause the Indian

10

lessors to have been "[d]ispossessed of the [*sic*] all the conventional incidents of ownership touching the power to lease their land . . . ." *Id.* at 1562. Here, the plaintiff has not alleged that she was in any way "dispossessed" of her land by a comprehensive regulatory scheme, as the plaintiffs in *Brown* were when trying to engage in commercial leasing. Instead, the plaintiff chose to enroll her land in the CRP, a voluntary government program, and chose to forgo any non-conforming activity that she and her family may have otherwise engaged in on this land. (*See* ECF 1 at ¶ 7.)

Crucially, unlike in *Brown*, the plaintiff has not identified any regulatory or statutory source for any alleged duty. Specifically, the plaintiff has not identified a regulatory or statutory source for the BIA's alleged duty to fulfill the terms of the CRP contracts when the plaintiff was unable to do so, despite the alleged failure to fulfill this duty being the crux of her breach-of-trust claim. (*Id.* at ¶ 26.) Under *Jicarilla Apache Nation*, the plaintiff's failure to identify a statutory or regulatory source for the fiduciary duties she alleged were breached is fatal to her attempt to invoke the jurisdiction of the Court of Federal Claims over her breach-of-trust claim. 564 U.S. at 178 (requiring the plaintiff to "point to a right conferred by statute or regulation" before inferring common-law fiduciary duties).

Instead, the plaintiff's complaint relies solely on the CRP contracts between her and the USDA, and co-signed by the BIA, as the source for the alleged "trust and fiduciary duties [the defendant] owed [the plaintiff] as an enrolled tribal member of the Blackfeet Tribe." (ECF 1 at ¶ 27.)[7] Although the plaintiff argues that the CRP contracts are a sufficient basis for jurisdiction

_____

[7] The plaintiff attempts to rely on the "CRP contract statutory and regulatory framework as a basis for jurisdiction pursuant to the Tucker Act." (ECF 7 at 11.) The plaintiff's brief, however, does not cite or analyze the CRP's statutory framework under 16 U.S.C. §§ 3831-3835, and only references one CRP regulation, 7 C.F.R. § 1410.32. (*Id.* at 4-5, 16, 18.) The plaintiff only cites this regulation to establish that the BIA had to co-sign the lease as the owner of Indian trust land without analyzing how it could create trust duties. (*Id.*)

The requirement for an owner to co-sign a lease does not create a trust relationship between Indians and the federal government because it is a bare approval requirement in a USDA regulation that applies to all landowners in the CRP, not just the BIA in its trustee role. Even if this requirement applied only to the BIA in its trustee role, a bare approval is insufficient to create trust duties. *See Navajo I*, 537 U.S. at 507-08 (cleaned up) (holding that the Secretary's role under the Indian Mineral Leasing Act in approving leases negotiated between Indian tribes and third parties did not create fiduciary duties because it "neither assigned [the Secretary] a comprehensive managerial role nor . . . expressly invested [the Secretary] with responsibility to secure the needs and best interests of the Indian owner . . . ."). Otherwise, the plaintiff's brief cites only one statute that might be relevant to her breach-of-trust arguments, 25 U.S.C. § 415, but does so only in the table of authorities. (*Id.* at 4.) Therefore, any argument based on 25 U.S.C. § 415 is waived.

under the Tucker Act, (ECF 7 at 16-19), the plaintiff has not alleged a breach-of-contract claim, (ECF 1 at ¶¶ 24-28.)[8]  The plaintiff has not identified any statutory or regulatory source of the fiduciary responsibilities she ascribes to the BIA under the CRP contracts, explained how the CRP contracts alone can create fiduciary responsibilities, cited specific CRP contract provisions as the source of the alleged trust duties, or cited any authority that a contract can create enforceable Indian trust duties that would confer jurisdiction in the Court of Federal Claims over the plaintiff's breach-of-trust claim.[9]  Despite the plaintiff's own recognition that a statute or regulation is required to support a breach-of-trust claim, (ECF 7 at 12 ("the tribal claimant must show a 'fiduciary' relationship created by a statute or regulation")), she has failed to allege the existence of such a statute or regulation in her complaint or her briefing.  Indeed, the plaintiff acknowledges that the general trust relationship between the tribes and the defendant on which she bases her Tucker Act claim is insufficient to support a breach-of-trust claim.  (ECF 7 at 12 ("Neither the 'general trust' relationship that historically describes the uneasy relationship between indigenous peoples and the United States Government, nor the basic common law of trusts, can alone give rise to a cognizable Indian Tucker Act claim.")); *see also Navajo I*, 537 U.S. at 506.

---

Therefore, the plaintiff has failed to analyze adequately how the CRP statutory and regulatory framework creates enforceable trust duties and has waived this argument.  Additionally, any reliance on statutes or regulations is contradicted by the complaint's allegation that "the substantive source of law is the contractual obligations the United States owes tribal members when representatives of the [BIA] co-sign [CRP] contracts with tribal members like Plaintiff."  (ECF 1 at ¶ 4.)

[8] The plaintiff's brief confirms that the plaintiff brought a breach-of-trust claim, not a breach-of-contract claim.  (ECF 7 at 8 ("On June 30, 2022, [the plaintiff] filed suit in the Court of Federal Claims alleging the BIA *breached its trust obligations* to her by failing to assist her in carrying out their basic contractual obligations of their co-signed CRP contracts . . . .") (Emphasis added).)  Therefore, whether the facts alleged in the complaint would support jurisdiction over a breach-of-contract claim, and whether such a claim would be timely, is not at issue because the complaint does not allege a breach-of-contract claim.

[9] To the extent the plaintiff raised other potential statutory sources for the alleged fiduciary duties at oral argument, such as the Violence Against Women Act and specifically its 2013 reauthorization, (ECF 11 at 73:2-21, 73:24-74:6), such statutory sources are not alleged in the complaint or referenced in the plaintiff's brief.  As such, any arguments concerning the statutes the plaintiff raised for the first time at oral argument are waived.  Even if the argument had not been waived, the Violence Against Women Act's provisions protecting tribal victims of domestic violence do not reflect the creation of any fiduciary responsibilities between the federal government and tribal members.  Violence Against Women Act, Pub. L. No. 103-322, 108 Stat. 1796 (1994); Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (2013); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, Division W – Violence Against Women Act Reauthorization Act of 2022, 136 Stat. 49, 840-962 (2022).

Alternatively, even if a contract could create fiduciary duties enforceable under an Indian breach-of-trust claim, the plaintiff has failed to state a claim on which relief can be granted because on their face the CRP contracts do not create such duties. While the plaintiff has offered the conclusional assertion that the CRP contracts are the alleged source of the trust duties, (ECF 1 at ¶ 4), she has not identified any contract provision as the source of the trust duties that she alleges were violated.

The CRP's regulations foreclose any possibility of a fiduciary relationship created by the CRP contracts. Section 1410.20(a)(9) of title 7 of the C.F.R. undermines any claim that the CRP contracts create trust duties in the plaintiff's situation. That regulation provides that all CRP participants must agree that a 0% participant is not liable for compliance with the terms of a CRP contract.

It is undisputed that the BIA signed the CRP contracts as a 0% participant, (ECF 1 at ¶ 15; ECF 6-1), and that the CRP contracts incorporated terms stating that a 0% participant is not liable under a CRP contract, (ECF 6-5 at 7 ("Participants that sign the CRP-1 with zero percent interest in the annual rental payment shall not be held responsible for contract compliance.").) Therefore, rather than create fiduciary duties, the CRP contracts and the relevant regulations disclaim the existence of any duties, fiduciary or otherwise, that the BIA might have otherwise acquired as a co-signer to the CRP contracts.

Thus, the plaintiff's claim must also be dismissed for failure to state a claim because the CRP contracts, as provided, cannot be read to create fiduciary duties.

### B.    The Statute of Limitations

In addition to the plaintiff having failed to invoke a money-mandating source of law for this suit, her claims are largely outside the Tucker Act's six-year statute of limitations.

The plaintiff's CRP contracts were terminated in November 2015, pursuant to a notice dated October 20, 2015. (ECF 6 at 9 n.4 (citing ECF 6-3); ECF 7 at 8 (citing ECF 6-3).) The plaintiff, however, did not file her complaint alleging a violation of the APA and a breach of the defendant's trust and fiduciary duties until June 30, 2022, more than six years later. (ECF 1 at 11.)

Claims under the Tucker Act are subject to the requirements of 28 U.S.C. § 2501, which provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." The Supreme Court has explained "the more absolute nature of the court of claims limitations statute," and that the statutory six-year limitations period generally cannot be waived or equitably tolled. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133-35 (2008).

The clock on the Tucker Act's six-year statute of limitations begins to run when a plaintiff's claim first accrues. "It is generally stated that a claim first accrues when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir.

13

1988) (internal quotation omitted).  "The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."  *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995).

Under the APA, a claim accrues when an agency has taken final action, which is dependent on "whether the agency has completed its decision[-]making process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

For a breach-of-trust claim, "[g]enerally, an action for breach of fiduciary duty accrues when the trust beneficiary knew or should have known of the breach."  *Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir. 1986); *see also San Carlos Apache Tribe v. United States,* 639 F.3d 1346, 1355 (Fed. Cir. 2011).  A claimant should know that a trustee has breached its trust obligations when the trustee repudiates the trust or takes actions inconsistent with its obligations. *Jones*, 801 F.2d at 1335-36.

### 1.    The APA Claim

The plaintiff argues that her APA claim did not accrue until the USDA issued its decision on the plaintiff's equitable relief request on February 19, 2021.  (ECF 7 at 19-20.)  Specifically, the plaintiff argues that "because [her] claims are based at least in part on her 2020-2021 appeal and the BIA's alleged misconduct during that administrative appeal process, her claim against the BIA did not mature until [the USDA] issued its final agency decision in 2021."  (*Id*. at 20.)

While an APA claim usually accrues upon final agency action, *Hopland Band of Pomo Indians*, 855 F.2d at 1577, the plaintiff's complaint is not based on the USDA's final action granting her equitable relief.  Rather, the plaintiff predicates her APA claim on the BIA's refusal to help her both perform the maintenance required by her CRP contracts and obtain equitable relief from USDA after the CRP contracts were terminated.  (ECF 1 at ¶¶ 19-22 (referencing the "BIA's failure to carry out its basic contractual duties under the CRP contracts it co-signed" and the "[d]efendant's failure to assist [the plaintiff]" as the acts that were "arbitrary, capricious, an abuse of discretion, and is not otherwise in accordance with the law").)

From the face of the complaint, the plaintiff alleges that the BIA's failure to assist her in performing the required maintenance on her land "resulted in the early termination of [the plaintiff's] CRP contracts after she was the victim of domestic violence."  (ECF 1 at ¶ 20.)  Even assuming the BIA's failure to assist the plaintiff in performing the required maintenance on her land could constitute reviewable final agency action under the APA, that inaction occurred no later than November 2015.[10]  At that point, the BIA's failure to act caused the plaintiff harm because it resulted in the termination of the CRP contracts.

---

[10] Agency action under the APA "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C § 551.

There was an administrative process for equitable relief from the obligation to repay CRP fees the plaintiff had previously received and potentially to reinstate the CRP contracts. (*See* ECF 6-3 at 2-4 (listing options for reconsideration, mediation, and appeals to the FSA state committee and USDA's National Appeal Division).)  That process, however, was unrelated to any alleged violation by the BIA to assist with performing the CRP contract-required maintenance.  The equitable-relief process was managed by the USDA, an agency distinct from the BIA, which is within the Department of the Interior.  The plaintiff has not explained why the USDA's appeal process would suspend the accrual of her APA claim against the BIA for the failure to assist with the maintenance required under her CRP contracts.  *See Martinez*, 333 F.3d at 1313-14 (concluding that claims under the Tucker Act begin to accrue when the plaintiff's monetary injuries begin and not when the defendant fails to remedy an existing monetary injury via an administrative corrections procedure); *cf. Young v. United States*, 529 F.3d 1380, 1384-85 (Fed. Cir. 2008) (noting that the accrual of a claim against the United States may be suspended only if the defendant concealed its acts or injury to the plaintiff was inherently unknowable).  Given the BIA is a separate agency, any claim against it cannot be subject to or dependent upon the administrative appeals processes of the USDA.

The plaintiff's APA claim for the BIA's failure to assist her in obtaining equitable relief from the USDA, however, appears timely.  Taking the plaintiff's complaint in the light most favorable to her, the equitable-relief process appears to have taken place in 2020 and only concluded in February 2021.  (ECF 1 at ¶¶14-15; *see also* ECF 7 at 8 (noting the BIA repeatedly refused to help with the administrative process during the "time period from 2020-2021").)  The defendant has not challenged the timeliness of this claim, and seemingly has conceded it.  (ECF 9 at 14 ("Plaintiff may have a point regarding the accrual period for any assistance allegedly due but not provided in her administrative appeal . . . .")) Thus, it appears that the plaintiff's APA claim as to the BIA's failure to assist her in obtaining equitable relief from the USDA would be timely if the APA could support such a claim, which it cannot.

## 2.     The Breach-of-Trust Claim

Concerning the plaintiff's Indian trust claim, the plaintiff's complaint alleges that the BIA's "failure to provide routine maintenance on her CRP fields" violated the BIA's trust responsibilities to the plaintiff.  (ECF 1 at ¶¶ 24-28.)  The complaint does not claim that the BIA's failure to assist the plaintiff *in seeking equitable relief* was a violation of the defendant's trust responsibilities.  (*Id.*)  Therefore, the only difference between the plaintiff's APA claim, as related to the failure to assist with the required maintenance, and the breach-of-trust claim is whether the plaintiff knew or should have known of the alleged breach of trust before June 2016.  If the plaintiff "knew or should have known" of the breach in November 2015, her breach-of-trust claim accrued outside of the statute of limitations.  *See Jones*, 801 F.2d at 1335.

Based on the domestic abuse detailed in the pleadings, the plaintiff understandably had difficulties in receiving communications from the USDA.  The plaintiff, however, admits she received an email from the FSA county office in the summer or fall of 2015 "stating she needed to take care of this maintenance and that it was time sensitive." (ECF 1 at ¶ 12; ECF 7 at 7.) The plaintiff has neither alleged nor argued that she did not become aware of the CRP contracts' termination in a timely manner.  The plaintiff does not dispute that the CRP contracts were

terminated in November 2015 via a notice dated October 20, 2015.  (ECF 7 at 8 (citing ECF 6-3).)  The plaintiff would have known of any breach of trust that occurred due to the BIA's lack of assistance with the CRP contract-required maintenance at the time she received notice of the termination of the CRP contracts or, at the latest, at the time contracts were terminated.  Indeed, the plaintiff's counsel acknowledged during oral argument that the plaintiff became aware of the termination of the CRP contracts sometime between fall of 2015 and early 2016.  (ECF 11 at 88:11-18.)  The plaintiff therefore "knew or should have known of the breach."  *See Jones*, 801 F.2d at 1335.  The plaintiff's breach-of-trust claim accrued before the end of June 2016, or more than six years before she filed this suit.

## IV.    CONCLUSION

The defendant's motion to dismiss is granted because the plaintiff has not invoked appropriate money-mandating substantive law to support jurisdiction under the Tucker Act.  The Court of Federal Claims has no jurisdiction over the plaintiff's APA claim.  The plaintiff's claim for breach of trust also must be dismissed because the plaintiff has not identified a statute or regulation as the source of the alleged fiduciary responsibilities.

Additionally, all but one of the plaintiff's claims is untimely.  The plaintiff's claims, to the extent they relate to the termination of the CRP contracts, accrued no later than November 2015 when the CRP contracts were terminated.  The plaintiff filed her claims in June 2022.  The plaintiff's claims, as they relate to the BIA's lack of assistance with performing maintenance under the CRP contracts, are untimely under the Tucker Act's six-year statute of limitations.

The complaint must be dismissed for lack of jurisdiction pursuant to RCFC 12(b)(1) and 12(h)(3).[11]  The Court will enter an order in accordance with this memorandum opinion.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

---

[11] The potential claims raised hypothetically by the plaintiff during oral argument and deemed waived because they were neither raised in the complaint nor argued in the briefs are not affected by this dismissal, although, for the reasons addressed above, it is unlikely any amended claims would be timely or state a claim for relief.